UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| DANIEL MARTIN GOLD, | : | |
| Plaintiff, | : | 17 Civ. 4650 |
| - against - | : | COMPLAINT |
| ALAN LESCHT & ASSOCIATES, P.C., STANLEY CHINITZ, and ALAN LESCHT, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Daniel Martin Gold, by his attorneys named below, for his complaint against defendants Alan Lescht & Associates, P.C., Stanley Chinitz, and Alan Lescht, respectfully alleges:

**Jurisdiction and Venue**

1. The jurisdiction of this Court rests upon 28 U.S.C. § 1332(a)(1), in that plaintiff and defendants, respectively, are citizens of different states of the United States, and the amount in controversy exceeds the sum of Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs.

2. A substantial part of the acts and omissions giving rise to the claim for relief set forth in this complaint occurred within the Southern District of New York.

**Nature of the Action**

3. This is an action for professional negligence in the form of legal malpractice. The relief sought is money damages, including the attorneys' fees authorized by statute that defendants' negligence caused plaintiff to forfeit, and the costs of suit. Damages exceed the sum of Nine Hundred Thousand ($900,000.00) Dollars.

**Parties**

4. Plaintiff Daniel Martin Gold ("Gold") is an individual residing in Fairfax, Virginia, and is a citizen of the State of Virginia.

5. Upon information and belief, defendant Alan Lescht & Associates, P.C. ("Lescht & Associates") is a professional corporation organized and existing under the laws of the District of Columbia, and having its principal office for the conduct of business at 1050 17th Street, N.W., Washington, D.C. 20036, and is for diversity purposes a citizen of the District of Columbia.

6. Upon information and belief, defendant Stanley Chinitz ("Chinitz") is an individual residing in New York City, New York, and is a citizen of the State of New York.

7. Upon information and belief, defendant Alan Lescht ("Lescht") is an individual residing in the District of Columbia, and is a citizen of the District of Columbia.

**Facts**

8. Insofar as relevant to this complaint, from January 1, 2012, until October 31, 2012, Gold was employed as a senior executive by a corporation known as American Medical Alert Corporation ("AMAC") under a written employment agreement, dated as of March 15, 2012, but effective from January 1, 2012 (the "Employment Agreement"). The Employment Agreement was for a three-year term expiring December 31, 2014.

9. When he entered the Employment Agreement, Gold had worked for AMAC for more than three (3) years, first as a consultant and then later as an employee. He had a solid relationship with AMAC's long-time chief executive officer, Jack Rhian. From the time he began working for AMAC, Gold reported directly to Rhian. That reporting authority continued under the Employment Agreement.

10. Under the Employment Agreement, Gold was formally named Senior Vice President and Chief Business Development Officer of AMAC, and was made responsible for all sales and business development activities of the AMAC unit known as the Health and Safety Monitoring Systems Division ("HSMS Division").

11. The HSMS Division of AMAC manufactured and sold devices for remote monitoring of patient health.

12. The Employment Agreement could be terminated by AMAC without monetary penalty only for "cause," as defined in the Employment Agreement. If it were terminated without proper "cause," AMAC would become liable to Gold for all compensation due him for its term.

13. In December 2011, Tunstall Healthcare (UK) Ltd. ("Tunstall"), a British company, acquired AMAC.

14. In March 2012, Tunstall terminated Rhian as AMAC's chief executive officer. The termination, which was initially without cause, was later changed by AMAC to a "cause" termination, and resulted in Rhian bringing litigation against AMAC and Tunstall.

15. After firing Rhian, Tunstall brought in a new chief executive officer, Bradley Waugh. Waugh began to put his own management team in place.

16. At the same time, AMAC began to diminish Gold's position and authority. It stripped him of his title as Chief Business Development Officer and of the most important duties that title carried. It excluded him from meetings of upper management. And it changed his reporting authority from the CEO to a new hire, an Executive Vice President of Sales and Marketing US/Canada. These acts constituted breaches of Gold's Employment

Agreement, and were known as such to AMAC. Gold made this known to AMAC, but the company persisted in breach.

17. Beginning in or about September and October 2012, it became apparent to company management, including Gold, that AMAC had been and was still having serious legal compliance issues. These related to fulfillment of its duties under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C.§ 1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (42 U.S.C. § 1301 et seq.) (collectively "HIPAA"), and obligations under laws and regulations relating to medical devices enforced by the U.S. Food and Drug Administration ("FDA").

18. Specifically, as to HIPAA, it became clear that the company was out of compliance with laws and regulations involving the identity and details of physical condition of customers, and as to the FDA, it became clear that AMAC had never registered its devices with the FDA, and had no systems in place to monitor its devices for FDA compliance and reporting requirements.

19. These HIPAA and FDA issues were extremely serious. A consultant retained by AMAC provided an estimate that it would cost between $3 and $7 million to remedy the issues. At the time, AMAC had yearly sales of approximately $50 million. The cost of repair would have significantly eroded, if not eliminated, AMAC's profits.

20. As Senior Vice President in charge of sales and marketing for AMAC, Gold had principal responsibility for dealing with AMAC's customers and prospective customers. In the same capacity, Gold was the executive of AMAC charged with executing contracts with customers on AMAC's behalf for the HSMS Division.

21. Because of the HIPAA and FDA issues referenced above, Gold was reasonably concerned that MAC might have legal liability, either civil or criminal, and that he also might have such liability especially if, with knowledge, he continued to represent to customers that AMAC was in HIPAA and FDA compliance, and executed contracts in which the same or similar warranties were made.

22. Gold made these concerns known to AMAC's senior management on numerous occasions.  The new CEO, Waugh, took the position that the former CEO Rhian must have known and failed to disclose these issues when Tunstall acquired AMAC.  AMAC changed its non-cause termination of Rhian into a cause termination.  Waugh declared that since he and other current members of management, including Gold, did not have knowledge of these issues until in or about September 2012, they had what he termed "plausible deniability." Waugh added, "If Rhian does it, it's fraud, but we get a pass."

23. Gold responded to that declaration by telling Waugh that that was an untenable position, and that once management had become aware, as they had, they had to act consistently with that knowledge.

24. Waugh nonetheless ordered Gold to execute contracts on behalf of the company containing warranties and representations concerning compliance that were untrue.  Gold refused.  Waugh told Gold that he himself would execute the contracts.

25. In October 2012, as the employment relationship between Gold and AMAC was growing ever more strained because of these issues, Gold determined to engage counsel to advise him and, if the decision to do so was taken, to initiate litigation and represent him in such matter.

26. Gold retained defendants Lescht & Associates, Chinitz, and Lescht on October 9, 2012. The retention was later confirmed by defendants under a written retainer agreement dated November 16, 2012.

27. Defendants first advised Gold concerning whether AMAC had breached the Employment Agreement, and in this connection, in October 2012, Gold drafted and defendants reviewed and revised a notice electing to terminate his employment for breach by AMAC.

28. Before Gold could deliver that notice, however, AMAC terminated his employment, alleging that the termination was for cause, and effective immediately the day notice was delivered, October 31, 2012.

29. In doing so, AMAC purported to rely for its alleged cause on interactions between Gold and a subordinate that had occurred earlier in October, and pointed to what it alleged was a breach of AMAC's Code of Business Conduct and Ethics.

30. Gold had not committed any act that constituted cause under the Employment Agreement.

31. AMAC's stated reason for termination was pretextual. AMAC in fact terminated Gold in retaliation against him because of his complaints concerning compliance and violations of law, and his refusal to approve and sign contracts with customers where AMAC was already in breach of its warranties and representations concerning compliance with law and regulation.

32. In doing so, AMAC violated New York Labor Law § 740, as well as breaching the Employment Agreement.

33. After AMAC had terminated Gold, defendants on Gold's behalf prepared a draft complaint containing, among other things, a cause of action under New York Labor Law § 740.

34. New York Labor Law § 740 grants a civil remedy to employees who suffer adverse employment consequences because they have complained of their employer's violation of law. Specifically, that section of the Labor Law provides:

> An employer shall not take any retaliatory personnel action against an employee because such employee does any of the following:
>
> (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud;
>
> (b) provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such violation of a law, rule or regulation by such employer; or
>
> (c) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation.

35. Defendants sent the draft complaint to AMAC, together with a demand letter in late December, 2012.

36. Notwithstanding delivery of the draft complaint and demand letter, AMAC would not entertain any settlement dialogue.

37. Defendants did not advise Gold of any statute of limitations issues pertaining to the draft complaint they had drafted on his behalf.

38. In December 2013, after defendants had done nothing further on the matter for months, Gold discharged defendants as his counsel and engaged new counsel.

39. New counsel commenced factual and legal investigations and prepared to file suit against AMAC. Among the legal investigations it undertook was into New York Labor

Law § 740.  Investigation uncovered the fact that the statute of limitations for violation of Labor Law § 740 was one year from the offense, and that that period had expired.

40.   Gold later sued AMAC in the United States District Court for the Southern District of New York (*Daniel Martin Gold v. American Medical Alert Corporation*, 14 Civ. 5485 (JFK) (the "Federal Action").  The Federal Action did not include a claim for relief under Labor Law § 740, as that claim was time-barred.  The Federal Action was settled and dismissed in May 2017.

41.   The generally accepted standard of care for legal professionals practicing in the City and State of New York includes the duty to ascertain the statutes of limitations applicable to claims reasonably capable of assertion by a client, to take appropriate actions to preserve such claims in view of the applicable statutes, and to advise the client in the circumstances.

42.   Defendants failed to adhere to this standard of conduct.

43.   They made no effort to ascertain the applicable limitations period pertaining to a Labor Law § 740 claim, they did not act to preserve that claim as they could have in view of the applicable limitations period, and they did not advise their client Gold of any of the foregoing.

44.   Had defendants properly preserved the Labor Law § 740 claim, Gold would have brought and prevailed on that claim in the Federal Action.  By their failure, defendants precluded the assertion of such a claim.

45.   Gold lost not only the value of such a claim had he prevailed on it, but also the settlement value that such a claim would have had in the Federal Action.

46. Gold has sustained injury and damages in an amount to be determined by the trier herein or otherwise, but consisting at the least of Six Hundred Thousand ($600,000.00) Dollars in money damages (the amount a jury would and could have awarded him on the forfeit claim), and at least Three Hundred Thousand ($300,000.00), consisting of the attorneys' fees authorized by statute that defendants' negligence caused plaintiff to forfeit, making in all the sum of Nine Hundred Thousand ($900,00.00) Dollars.

## CLAIM FOR RELIEF
### (Legal Malpractice)

47. Plaintiff repeats and realleges each allegation contained in paragraphs "1" through "46" of this complaint as if fully set forth at length herein as paragraph "47" hereof.

48. By reason of the foregoing, defendants committed the tort of legal malpractice.

49. Gold has sustained injury and damages.

50. Gold is entitled to recover his damages as aforesaid, as well as applicable prejudgment interest and the costs of this suit.

WHEREFORE, plaintiff demands judgment against defendants in the sum of at least Nine Hundred Thousand ($900,000.00) Dollars, together with applicable prejudgment

interest, the costs of this action, and such other and further relief as the Court may deem just and proper in the circumstances.

Dated:   New York, New York
         June 20, 2017

                                KARLINSKY LLC

                                By: /s/ Martin E. Karlinsky
                                    Martin E. Karlinsky, Esq.
                                    Bonnie H. Walker, Esq.
                                1500 Broadway, 8th Floor
                                New York, New York 10036
                                (646) 437-1430
                                martin.karlinsky@karlinskyllc.com
                                bonnie.walker@karlinskyllc.com

                                *Attorneys for Plaintiff Daniel Martin Gold*